Messrs. Ingersoll, Lewis and M. Levy, *pro quer.*

Messrs Rawle, Dallas and Milnor, *pro def.*

---

RICHARD PENN *against* ANN PENN and JOHN F. MIFFLIN, executors of JOHN PENN, deceased.

Construction of family agreements and wills. Arguments thereon.

CASE stated for the opinion of the court. On the 8th May 1732, John Penn, Thomas Penn and Richard Penn, sons of William Penn, the first proprietor of Pennsylvania, and the three lower counties, were seized in fee or entitled to the same, and to divers quit rents, lands and hereditaments therein, as tenants in common, as follows : John Penn to one moiety, Thomas Penn to one fourth, and John and Thomas Penn to one fourth remaining, in trust, for the said Richard Penn.

On the day and year aforesaid, the said John, Thomas and Richard, by articles of agreement *tripartite*, for their better promoting their interest in the premises, agreed (*inter alia*) "that in order to preserve the said estates to the respective heirs male of the bodies of the said parties respectively, and for default of such heirs male, to the survivors and survivor, subject to such charges as are therein after mentioned, and for the more easy disposing of so much and such parts of the lands and hereditaments in the said province and counties as are yet uninhabited and undisposed of, to such persons as shall be minded to purchase the same," they the said parties, &c. covenant, &c. to and with the others, &c. that in case of the death of any or either of the said parties, leaving heirs male of

their bodies respectively under the age of 21 years, in such case the survivors or survivor of the said parties, &c. during the respective minorities of such heirs male, are authorized to sell and convey in fee simple or otherwise, any parts of the land in the said province and counties, &c. reserving at least the usual quit rents, and to receive all such money and consideration as can be gotten therefor, and to receive and give discharges for all quit rents and sums of money and demands which may be at any time due on account of, or relating to the said province, counties and premises, and to pay all sums necessary to be paid on account thereof, and to manage and transact all affairs and business concerning the said premises; but to be accountable annually for the nett profits to such person and persons as shall be entitled to demand the same ; but at the age of 21 years, such heir male of the body respectively, shall have possession of the share of his father respectively. Also, that neither party should by his will or otherwise, dispose of his share or estate in the said province, counties and premises, to any child except to his eldest son in tail male, with remainder to his second, third and other sons in tail male successively, except as to the charges, &c. therein after agreed on, &c. And it was further provided and agreed, that in case any or either of the said parties to the said agreement should happen to die, leaving one or more daughter or daughters, but no son, or, having a son or sons such son or sons should die before the age of 21 years, or die leaving no issue male, then and in either of the said cases, the estate and share of in and to the said premises of the party or parties so dying, shall come to the survivors or survivor of them the said parties his and their heirs, as the party or parties so dying, should by his or their last will in writing, or by any deed in writing executed in the presence of two or more credible witnesses appoint but chargeable, &c. And it was further provided and agreed, that in case the said parties to these presents, or any or either of them should happen to die, leaving only one or more daughter or daughters respectively and no son, and should make no appointment of his or their respective estate or share of and in the said premises, that then and in such case such estate and shares respectively should come to the survivors and survivor of them the said parties equally and to the heirs male of their respective bodies, and for want of such heir, to the survivor and his heirs, but charged, &c. ( *prout* agreement.)

And it was further declared and agreed, that in any case any or either of the said parties should die without issue, then and in such case he and they shall leave and appoint his or their respective share or estate to the other of the said parties, or either of

them, as he shall think fit, and shall have liberty by any will or deed to be attested as aforesaid, to charge the same, &c.; as in the agreement mentioned. And it was further declared and agreed by and between the said parties, that in case any or either of them should die without issue and without making any appointment or devise of his or their respective estates or shares to any other of the parties, or of any money out of the same, (except the sum or sums respectively, which he or they had severally power to appoint for his or their respective widow or widows,) that then and in such case, the said estates and shares of the party and parties so first dying, shall go to the survivors and survivor of them, and his and their heirs, but charged, &c., as in the agreement mentioned. And it was further declared and agreed by and between the said parties, that it should be lawful to, and for the said parties, at any time during their joint lives, by any writing under their hands and seals, attested by two or more credible witnesses, to revoke, determine and make void the said articles of agreement, and all and every or any the clauses provisoes and agreements therein contained, any thing therein contained to the contrary thereof, in any wise notwithstanding. And it was further declared and agreed by and between the said parties, that in case one or two of the said parties should happen to die leaving no issue male respectively, that then and in such case and cases, it should be lawful to, and for the survivors and survivor of the said parties, by any writing under their respective hands and seals; to alter, revoke and make void the said articles of agreement, and every clause, proviso and agreement therein contained ; but so as not to prejudice any devise, provision or appointment which may have been by the party or parties first dying made in pursuance of the said articles.

On the 24th October 1746, the said John Penn made his testament and last will in due form executed, and thereby devised his moiety of the province of Pennsylvania, and three lower counties, and of the lands, tenements, quit-rents and other rents, hereditaments, royalties, franchises, &c., thereto belonging or appertaining, to his brother Thomas Penn, for life, and from and after the determination of that estate to Thomas Hyam and David Barclay and their heirs, during the natural life of the said Thomas Penn, to preserve contingent remainders, remainder to the first son of the said Thomas Penn and the heirs of his body lawfully begotten or to be begotten, &c., remainder to his brother Richard, and his first, second, &c. sons in tail, (similiter,) with power to the possessor for the time being, to sell the lands in fee simple, &c. And he further devises the arrears of rents, quit-rents, fines, purchase money due at

his decease to his brother Thomas Penn his executors, administrators and assigns, (*prout* will.) He died in the same year, unmarried, and without issue.

On the 31st January 1750, articles of agreement were concluded on between Thomas Penn and Richard Penn ; reciting, that whereas certain articles of agreement, bearing date about the 8th May 1732, between John Penn, Thomas Penn and Richard Penn, (among other things,) provided, that neither of the said parties should by will or otherwise, dispose of his estate or share to any child, except to his eldest son in tail male, with remainder to his second, third and other sons successively in tail male, and reciting that they conceive it may become necessary, that in an estate of such nature, like powers and authorities, as were given by the will of John Penn, deceased, to the possessor for the time being of his moiety of the said estate, should likewise be given to the possessor, for the time being of their respective quarter parts of the same premises, and the parties do in consequence of an agreement, intend to revoke the said agreement *tripartite,* as far as the same is inconsistent with this agreement, ratifying and confirming the rest. They enable each one of the parties to charge his quarter part in behalf of his widow to a certain extent; further, that it should be lawful for the male issue and male descendants of the body of the said Thomas and Richard, and such other male person being in possession, or being the heir male apparent, to charge the same premises for their widows in the same manner; and revoke all wills and settlements separately made, declaring they mean hereafter to dispose of their parts entirely, and not to split the same into several parts or branches, and to subject the same to the restrictions, and to vest the possessor with the powers therein contained. It was thereby further agreed, that all and every person and persons to whom the several parts should at any time come by settlement, devise, donation, disposition, descent, or in any other manner, should during the time of his possession, have full power, notwithstanding the beneficial interest in the said part may be settled to, or upon him for some limited estate or interest, namely for years, or for life, or in tail, and notwithstanding any charge or burthen for widows, &c. to—1st. Grant any estate or interest how large soever, of any lands or other hereditaments on the usual quit rents, except land on the frontiers, granting the same for the general service and not for the private utility of the possessor, on such rent as the possessor shall think proper; but in such cases no fine or purchase money to be taken, and the quarter part of such quit rents reserved on such grants, shall de-

scend and go along with the estate and inheritance; but all fines and purchase money shall, as to the respective quarter parts, belong to the possessor for the time being of each respective quarter part, as his own proper money. 2d, For settling boundaries. 3d, For appointment of governers, &c. 4th, For carrying on government. 5th, For making treaties. 6th, For every general authority. The parties further ratify the former articles, as far as they are consistent with the last. It is further provided, that it should be lawful for the parties at any time during their joint lives by any writing under hand and seal, attested by three or more credible witnesses, to revoke these last articles, so as not to prejudice any charge theretofore made in pursuance thereof.

On the 20th March 1750, other articles of agreement were concluded upon between Thomas Penn and Richard Penn, reciting the agreement aforesaid of 8th May 1732, between John Penn Thomas Penn and Richard Penn relating to the moiety then of the said John Penn, and the respective quarter parts of the said Thomas Penn and Richard Penn of and in the seignory, fee simple and inheritance of the province of Pennsylvania, and reciting that the asid John Penn had since deceased a batchelor, having devised his moiety, as in his will is expressed, and reciting that certain other articles, bearing date on or about the 31st January then last past, made between the said Thomas Penn of the other part, and the said Richard Penn of the other part, were executed by the said Thomas and Richard, whereby some part of the former articles of 1732 were revoked and varied with respect to the several and respective quarter parts of the said Thomas and Richard, in the said province, and new agreements then concluded upon, and the other parts of the said articles ratified and confirmed; and reciting, that whereas the said Thomas and Richard always intended that the male issue of either of them should be preferred in succeeding to both or either of their respective quarter parts of the said province before any issue female, but never meant in case there should be no issue female of either, that the right heirs of the survivor should succeed to the quarter part of the person so first dying, in case the person so first dying left heirs of his body, distinct persons from the heirs of the survivor, and yet the said articles may admit of such construction, the said Thomas and Richard therefore agreed to alter the articles in this respect, and they agree that either of them may settle his quarter part by will, deed, &c. to his own issue female, to take before the issue female of the other, and that if one of the parties (who should die before the other of them) should have no issue male, but should have issue female, or should leave issue male which should fail,

and also should leave issue female, then, and in any such case, the party so first dying, immediately after limiting an estate for life in his quarter part to the survivor with an estate to trustees during his life to support contingent remainders, and limiting successively to the son and sons of the survivor for his and their several and respective lives, with estates to trustees during his and their lives to support contingent remainders, and limiting several and successive estates in tail male to the issue male of such son and sons, shall and may limit the next remainder of his quarter part to the heirs of the body of the party so first dying before any of the female issue of the survivor; and they revoke the former articles so far as they differ from the present, confirming the residue of the said articles of 1732, as altered by the articles of January 1750, and confirming the last so far as they are not contrary to these presents: Provided that it should be lawful to and for the parties to the last articles, jointly during their joint natural lives by any deed, instrument or writing, delivered in the presence of three or more credible witnesses, to revoke and annul the last agreement, and also the articles of January 1750 and those of 1732, and by the same instrument to conclude upon such other agreements relating to their respective quarter parts of the said province, as they should think meet, so as not to prejudice any settlement made in pursuance of the last articles, before revocation.

On the 21st March 1750 (O. S.) Richard Penn made his last will and testament, in which he devised his fourth part of the province and three lower counties, and the lands, rents, &c. royalties, &c. to his eldest son John, for life, and on the determination of that estate, to trustees, &c.; remainder to the first and other son of the said John Penn in tail male; remainder to the testator's son Richard, (*similiter*)&c. and declared (*interalia*) that although the rents, quitrents, fines and purchase money, growing due in the time of each owner of his own one fourth part of the province and counties, may in strictness be considered due to and part of the personal estate of such owner at his decease, yet, to avoid confusion, and for other reasons assigned in this will, his will was, that all such rents, &c. fines, purchase money, &c. due in his the testator's time, and not collected the next quarter day after his decease, shall go with the province, &c. to the next person in remainder to whom he had limited his fourth part of the province and counties as above. He further devised the residue of his estate to his son Richard, &c. (*prout* will.)

On the 18th November 1771, Thomas Penn made his last will, and declared in substance as follows: "Whereas there may be due

to me at my decease, as one of the proprietors of Pennsylvania, and the three lower counties, several considerable sums of money, &c., arising from rents, quit-rents, fines and purchase money, and from arrears of the same, in respect of my brother John's moiety, and my one-fourth part of the same, I devise so much of the said money as shall not be vested in America by the next quarter day after my decease, &c., and so much, &c., as shall not by such day appear on the face of the receiver general's accounts, &c., to such persons, &c., of my family respectively and successively, who shall from time to time succeed, &c., to the possession of my one fourth part, &c., from time to time, at the several and respective times, when the same shall be collected and gotten in, &c."

This is declared to be done, in order to prevent the infinite troubles and inconveniences which might otherwise arise, and he recommends the same measures to his successors, &c., (*prout* will.)

Richard Penn aforesaid died in 1771, leaving lawful issue, John Penn the 2d, now deceased, and Richard Penn the 2d, now living.

Thomas Penn aforesaid, died on the 21st March 1775, leaving lawful issue male John Penn the 3d, of Stoke Pogis, now living.

Upon the decease of the said Richard, his eldest son John Penn, now deceased, did receive the arrears of rents, fines, purchase money, &c., due in the life-time of his said father, and when he did so receive them, he knew of the existence of the several articles of agreement; but he did not know until the 24th February 1787, that he, under the said articles of agreement, or any of them, was entitled to an equitable estate in tail in the late province of Pennsylvania, or other real estate in the said articles mentioned.

Upon the decease of the said Thomas Penn, his eldest son John did receive the arrears of rents, fines purchase money, &c., under and by virtue of the will aforesaid of the said Thomas Penn.

On the 17th May 1774, a deed *tripartite* was made between Richard Peters, Lynford Lardner and Richard Hockley, trustees, &c., of the one part, John Penn, eldest son of Richard Penn, deceased, of the second part, and Richard Penn, the other son of the said Richard Penn, deceased, of the third part; in which, after reciting the will of Richard Penn, the father, devising the province, &c., to the said John Penn for life, and also reciting the devise of all the testator's private and particular rights to manors, lands, &c., or the shares of any manors, lands, &c., to be sold and disposed of, and the proceeds to be remitted to his

executors in England, &c. and that a question was made, whether
the one fourth part of the manors, lands, &c. ought to be sold by
virtue of the devise, and the money remitted, &c. the said Richard
Penn, the son, released to the said John Penn, "for several good
causes and considerations, him thereunto moving, and for the sum
of five shillings, " all his the said Richard's right, title and interest,
or, in, and to the said father's one fourth of the said manors, lands,
&c. to hold to the said John Penn, for such term and estate, &c.
as by the will of the said testator is annexed to the quarter part of
the province, &c.   The trustees, in like manner, convey all their
right, estates, &c. to the said John Penn, to be held to and for such
uses, estates, &c. as in and by the last will and testament of the
said Richard Penn, is vested in and settled upon the said John
Penn during life, and to the heirs male of his body after his de-
cease, &c.

[This deed was executed by the trustees aforesaid and the said
Richard Penn, but not by the said John Penn.]

On the 27th November 1779, the act of assembly of Pennsylva-
nia passed, entitled "an act for vesting the estates of the late pro-
prietors of Pennsylvania, in this commonwealth." (*Prout* act.)

On the 14th March 1787, the said John Penn, son of Richard
Penn, and the said Richard Penn, his brother, duly executed certain
articles of agreement under their hands and seals, in which, after
reciting the act of assembly of the 27th November 1779, and " that
it was reasonable and proper, that after so great an alteration in the
affiairs and estate of the proprietary family, the money mentioned
and directed by the said act of assembly, to be paid to the devisees
and legatees of the said Richard Penn, deceased, should be settled
and proportioned in an equitable and conscientious manner, as far
as concerns the said John Penn and Richard Penn, parties thereto ;
it was therefore thereby mutually covenanted and agreed by and
between the said parties, that all that part or share of the afore-
said sum of 130,000*l.* sterling, directed by the said act of as-
sembly to be paid to the devisees and legatees of Thomas Penn
and Richard Penn, which has been or shall be paid during the
natural life of the said John Penn, to the devisees and legatees
of the said Richard Penn, deceased, shall be received by the
said John Penn, and that the said John Penn shall pay over
one fourth part of thereof to the said Richard Penn, and his
representatives, from time to time, as often as he shall receive
the same.   And it was further thereby covenanted and agreed
by and between the said parties, that all the moneys arising

vesting his eldest son with an estate tail. Thomas likewise in 1771, from the sales of any such lands, tenements and hereditaments in Pennsylvania, as were or are the property and estate of the heirs or devisees of the said Richard Penn, deceased, originally made not before, but since the 27th November 1779, or which shall hereafter be made by the John Penn, during natural life, shall be received by the said John Penn, and that the said John Penn shall pay over one-third part thereof to the said Richard Penn, and his representatives from time to time, as often as he shall receive the same. Provided always, and it was thereby covenanted and agreed between the said parties, that nothing therein contained shall prevent or disable, or be construed to prevent or disable the said John Penn from exercising the powers with which he is vested, under former agreements and wills, so far as to grant and dispose of any part of the lands, tenements and hereditaments aforesaid, in order that the same may be reconveyed, two-third parts thereof to the said John Penn, or his heirs, and the other third part of the same to the said Richard Penn, and his heirs, in fee simple, reserving thereupon ome quit rent."

On the 2d January 1795, the said John Penn, son of the said Richard Penn, made his last will and testament, and thereby devised, (*inter alia*,) all the rest and residue of his estate, real and personal and mixed, to his wife Ann Penn, her heirs and assigns forever; and appointed his said wife and the said John F. Mifflin the defendants, executors thereof. ( *Prout* will. )

The question submitted to the consideration of the court was, whether the plaintiff Richard Penn, is entitled to all the money due on the sales of lands made by John Penn, the defendant's testator, which were not collected in by the quarter day next after the decease of the said John, or only to one-third part thereof?

The case was argued very fully at the last term by Mr. M. Levy for the plaintiff, and by Mr. Ingersoll for the defendants; and again this term, by Mr. Dallas for the plaintiff, and by Mr. Lewis for the defendants.

The substance of their arguments was as follows:

For the plaintiff. The case may be divided into three distinct heads, by considering 1st, What was the state of things previous to the will of Richard in 1750. 2d. What under that will; and 3d, What was the effect of the articles of 1787.

1. Our opponents will contend, that John Penn, (the 2d,) was tenant in tail in possession, under the articles of 1732, which

stipulate, that " neither party should by his will or otherwise, dis-- pose of his share in the province to any child, except to his eldest son in tail male, with remainder to his 2d, 3d, and other sons in tail male, successively." And that on a bill filed by the same John, equity would have decreed accordingly. But to this we an- swer, that a Court of Chancery in estates not strictly legal, regards more the intention than the letter of an agreement. Fearne's Con. Rem. 61, 62, (5th edit.) So it is as to trusts and marriage arti- cles. *Ib.* 81, 82. It is stated in the case, that John, (the first,) and Thomas held one-fourth part of the estate in trust for their brother Richard ; and a chancellor would not have decreed specific execu- tion of the agreement to John (the 2d,) as tenant in tail, if the in- tention of the parties could be better effectuated by considering him as tenant for life, under a . strict settlement. This is obviously the case here.

The leading objects of the articles of 1732, were to secure this immense property in the family, by limiting the same to the suc- cessive heirs male, and the contemplated remainder-men, preserv- ing the entirety of the estate, and authorizing sales in case the per- sons entitled were in a state, of minority. Each had a power to sell, offering the pre-emption to the other brothers. If one died, leaving female or no issue, the remainder might be limited and ap- pointed to the surviving brothers, as he saw fit. To meet all con- tingencies, they reserved to themselves a joint power of revocation. Nothing is mandatory as to selling to an heir male. The origi- nal intention of the ancestors is manifest. All the parties show in the clearest terms, their sense of the mutual obligation they had imposed on each other. John, (the 1st,) in 1746, devises his moie- ty to his brother Thomas for life, then to trustees, remainder to his first son and the heirs of his body, remainder to his brother Rich- ard, *in like manner.*

The two agreements of 1750, consider this will of John as a faithful execution of the first agreement. The former of them guards more strongly the entirety of the estate, and prevents the same from being split into parcels. This seems the most favorite point. The quality or quantity of the estate is not contemplated. Richard in 1750, devises his fourth-part to his eldest son John for life, then to trustees, remainder to his first and other sons in tail male, remainder to his son Richard, in the like manner. This will was made on the day succeeding the last articles, when the family agreements must have been fresh in their minds and under the in- spection of eminent counsel. It can scarcely be believed, that Richard would have made such a will, if he was deemed restricted to

devises his three-fourth parts to his eldest son John for life, remainder to his first and other sons in tail male, remainders over. Thus is seen the cotemporaneous exposition of all the the parties to the first agreement. A clause in the second agreement provides, that though the persons in possession may have a limited estate settled on them for years, for life, or in tail, yet they shall have power to grant any estate or interest, how large soever, of any lands, or other hereditaments, on the usual quit-rents.

Until 1787, John Penn, (the 2d,) was always deemed to be a mere tenant for life under his father's will, and he uniformly considered himself as such. He was a party to the deed in 1774, and though he did not execute it, he accepted a beneficial interest under it. He is therein styled tenant for life, and the words of an indenture bind all parties, if it has any effect in their favor. It cannot be denied, that it is strongly expressive of the sense of the family, and that under these impressions the trustees and his brother executed the conveyance. The original agreement of 1732, must have been considered as revoked, in the particular of an estate tail being necessarily attachable to the interest of the eldest son, by common consent, and by the subsequent wills and agreements of all the parties, considered in one general and united view.

2. Richard Penn, (the 1st,) had the uncontrolled power over his personal property, and had a right to grant it under such qualifications as he thought would best conduce to the peace of his family. He possessed the right of imposing a moral obligation on his successors, that their shares of accumulated personal property arising out of the sales of lands, outstanding and uncollected by them, should pass with the inheritance, and they were bound to co-operate with him. He therefore couples his personal gift with their personal obligation to perform the condition, in order to prevent future mischiefs. He devises to his eldest son John, his fourth part of the province and lower counties for life, in strict settlement, and subjoins the conditions as to the arrears of rents, quit-rents, fines, and purchase money going to the next possessor. The defendants' testator entered into possession under his father's will, to which this express condition was annexed, and he received rents and purchase money, which strictly belonged to his father's personal property. He shall not therefore disappoint the intentions of his father's will, under which he derives a benefit. So are all the cases. 2 Vern 581. 1 Vez. 301, 302, 306. A small matter will amount to an election. Ambl. 430. 2 Vez. 12. Cas. Temp. Talb. 176, 182. Wills shall be so construed as to effectuate the intentions of testators ; and the words *ad faciendum exin ten-*

*tione*, *and ad effectum*,&c. will create a condition in a will. 1 Bac. Ab.
631. Devise to a hospital on condition of maintaining six children, after
entry the hospital shall be bound thereby,though the rents be insufficient.
3 Bro. Cha. Rep. 165. Wherever a devisee takes lands under a will,
he must take them subject to the conditions imposed therein. 1 Vez.
44. 1 Bro. Cha. Rep. 119, 120, 191. 2 Atky. 127. 1 Wms. 448,
457. 2 Wms. 513, 612. Hargr. Co. Lit. 237.

3. On the death of the defendants' testator, the plaintiff became
tenant for life, in strict settlement, of the residue of the estate form-
erly of his father. The law of the 27th November 1779, had no effect
on the private interests of the proprietary family. It was intended in
favor of devisees and legatees ; but here the executors claim an interest
in their testator by descent.

The articles of 1787 had two objects in view, the division of the
one fourth part of the legislative donation, and of the moneys arising
on the sales of lands made by John Penn (the 2d) during his life, af-
ter the 27th November 1779.

The deed of 1774, shows the intention of the plaintiff to conciliate
with his brother, as to the sales of the manors and private estates. He
was the heir apparent in 1787, when the prospect of his brother's hav-
ing issue was almost extinct, and if the divesting law had not passed, his
chance of inheriting a princely estate was very great. It is clear that
the grant of the 130,000*l.* sterling, was intended in fact as an equiva-
lent for the proprietary public property ; but though the legislature re-
served to themselves the future adjustment of the proportion of each of
the devisees, they never could have meant to sacrifice the plaintiff. It
is absurd to suppose that all the unappropriated lands in Pennsylvania,
could have been taken up and converted into cash, during the life of
John Penn, (the 2d.) To admit that the one eighth or one tenth parts
hereof could have been thus disposed of, is a large calculation. And yet
according to the defendants' doctrine, the whole of the 130,000*l.* com-
ing to the devisees of Richard Penn, must necessarily be received by his
eldest son, for his own emolument, if he survived the last payment.
The power to sell in the articles of 1732, relates to the uninhabited lands.
The legislature who introduced the evil, would have regulated the mis-
chief. If John Penn, (the 2d,) was but tenant for life, he could only
be entitled to the interest of the quarter part of the sum granted by
the assembly. But a compromise between the brothers was deemed
most eligible, which however only extended in both cases to moneys
paid in the life of John. In the instance of the donation, it was so
stipulated in express terms. In the case of lands sold by John,

after the passing of the law, the agreement calls for personal acts to be done by him, viz. the receiving and paying of the money. Bonds and other securities are not included in the term moneys, nor cannot as such, be:paid over by the executors. A due regard was contemplated by both brothers, to be paid to their father's will. Where the representatives were intended to take, it is clearly expressed in so many words, as to the one third of Richard. But no such thing was meant as to John, otherwise it would also have been inserted. The interest of John was only transmissible to his executors or administrators, in the single case of outstanding money, paid within three months after his death. Under all the circumstances it is contended, that the compromise was as beneficial to John, as he could reasonably expect, and that his executors insisting on the receipt of two thirds of the money collected generally after his death, either of the donation or sales of lands, is "inequitable " and unconscientious," and not warranted by the agreement.

For the defendants. Nothing can be more express than the articles of 1732, that "neither party shall by will, or otherwise, dispose of his estate in the province to any child, except to his eldest son in tail male, with remainders over to his 2d, 3d, and other sons in tail male, successively." This convenant was not annulled by any of the subsequent agreements, which severally confirm the former in such instances, as they do not vary therefrom. All the powers of revocation required a joint act during their joint lives, and in no other way could the power be pursued. The will therefore of Richard, made during the life of his brother Thomas, could not have effected a revocation in this particular, even' if he had so intended. The quantity of estate to the eldest son is specially designated, as well as the entirety of it. And it is of no moment whether the estate be legal or equitable, as it is accompanied with a power of disposition. Parties acting under family arrangements are bound thereby, and cannot derogate from their solemn agreements.

The plaintiff's claim is founded on the principle, that personal estate may be intailed ; but it does not exist in law. Richard the father, had the undoubted right of selling his lands. The moneys arising thereform because his personal property, which he might dispose of as he thought proper. But he could not legally shackle moneys arising on sales made by his son John. Though the lands went in tail male, yet the possessors for the time being were entitled to the consideration money of the lands sold.

The deed of 1774, has no reference to the present question. It

respected the proprietary private estates, not the great mass of public property. The defendants' testator never executed it; nor can the insertion therein of his holding a tenancy for life, divest him of an estate settled on him before. Besides, it is stated in the case, that he did not until the 24th February 1787, know of his being entitled to an estate tail in the premises. Both parties possessed the same means of information. The plaintiff, when he styled his brother tenant for life in the deed of 1774, was necessarily put on the inquiry as to the extent of his title.

Independent however of these considerations, it is apprehended, that the last agreement of 1787, comprises the whole case. It was entered into by both parties, with full knowledge of their separate claims and interests, on mature deliberation. They were competent to make an arrangement, so far as they were concerned, and where their own property was the object. John Penn, (the 2d.) was either tenant in tail, or at least for life, of his father's estate in Pennsylvania, with a power of selling all the lands and receiving the consideration money, without being accountable to his brother. Admit, that his brother was entitled as next remainder man, to the lands unsold and moneys uncollected in the life-time of John. How different was the estate when the law passed in 1779, from what it was formerly.

It is agreed, that the donation was an equivalent for the late proprietary lands. It is impossible to ascertain what would have been the decision of the legislature on a claim by John of one-fourth of the 130,000l. sterling; but it seems natural to conclude, that as the yearly payments were not to exceed 20,000l., nor be less than 15,000l., and the first sum was not to be paid until the expiration of one year after the termination of the existing war, that whoever was the legal possessor of the different shares, should receive the same as the instalments became due. The plaintiff grounds his present claim to the outstanding moneys, for his own separate use, on no better foundation. Admit that the defendant's testator was advanced in life, he had the less prospect of surviving the entire discharge of the sum, and must have incurred that risk. By the articles he permits his brother to receive one third part of the payments as they arise, for his separate use, though he could not have any possible claim thereto, during the life of John; he goes further, and agrees that in case he outlives his brother, his representatives shall be entitled to the same proportion of the cash. Can it be conceived, that the widow of John was meant to be placed in that state, that his two thirds were to sink absolutely upon his death? With respect to the sales of lands made after the

27th November 1779, under the authority of John in his life, no time is annexed to the collection of the moneys arising thereupon. The plaintiff, and his representatives likewise, are let into one third of that fund, in the life of John. If these moneys are likewise to sink into the inheritance on his death, what is it which the plaintiff give up by these articles, and why did he execute them? The cessions are all on one side, without the smallest tincture of equality! The widow of John has received no provision under any of the agreements or wills. But the proviso removes every seeming difficulty about the true construction of this contract. If all the lands should not be sold by the defendant's testator, he might grant and dispose of what remained, and obtain a reconveyance of two third parts to himself in fee, as of his own private estate, and the other third to his brother in like manner. Taking the plaintiff's sense of the agreement, this clause is absolutely unintelligible? It was competent to John to have obviated every difficulty which might occur by the grants he was empowered to make. But a verbal criticism is relied on by our adversaries. The acts of paying and receiving money are personal, as to John. It will scarcely be asserted, that if his executors had received money to which the plaintiff was entitled, that he could not have maintained a suit against them. On what grounds does the present action rest? But in the eye of justice and common sense, the executors of John are included in this agreement, and so are they in contemplation of law. An executor represents the person of his testator, though not named in a deed. 11 Vin. 129. Q. pl. 2. So in assumpsit. Cro. Jac. 663. A bond not payable to executors may be recovered by them. 2 Atky. 909. Executors are included, though not named in a contract; they are assigns in law. Plowd. 288.

*Curia advisare vult.*

The court on the——day of——proceeded to give their opinions *seriatim* in this case.

Shippen, C. J. This is an action on the case brought for money had and received by the defendants to the use of the plaintiff. The defendants acknowledge the receipt of the money, but allege it was money they had a right to receive to their own use.

In arguing this case, large ground has been taken; old family settlements, wills, and ancient as well as more recent agreements have been resorted to, all, I presume, to enable the court to make a proper

construction of the last agreement made on the 14th March 1787, on which the whole question depends.

By the articles of agreement executed the 8th of May 1732, between John, Thomas and Richard Penn, the three sons and devisees of of the first proprietor, William Penn, it was the evident intention of the parties to preserve their estates in the province to the heirs male of the bodies of the parties respectively, and at the same time to obviate the mischiefs which might arise from such a restriction of the estate, as should prevent the alienation and improvement of the lands. For the purpose of continuing the estate in the family, it was covenanted between them, that neither of the brothers should by will or otherwise, dispose of his share or estate in the province to any child, except to his eldest son in tail male, with remainder to his second, third and other sons, in tail male successively. And for the purpose of facilitating alienations to purchasers, in order to improve the lands, it was provided, that in case of the death of either of the parties, leaving issue under twenty-one years of age, the survivors and survivor should sell and convey to such purchasers in fee simple.

John Penn, the eldest of the three brothers, being entitled to one moiety of the province, did by his last will and testament, dated the 24th of October 1746, devise the same to his brother Thomas for life, remainder to trustees to support contingent remainders, remainder to the first son of Thomas in tail male, remainder to his brother Richard, and to his first, second and third sons in tail, with power to the several possessors for the time being, to sell the lands in parcels, in fee simple. By thus devising the estate to his brother Thomas for life only, John did not depart from the terms of the article of 1732, which confined the disposition in tail to a child only, and John died without any child; on the contrary, he conformed strictly to the spirit of that agreement, by expressly giving an estate tail to Thomas's eldest son. John likewise gives the arrears of quit rent and purchase money due at his decease to his brother Thomas, his executors, administrators and assigns.

Some time after the death of John, on the 31st of January 1750, new articles of agreement were executed between the surviving brothers, Thomas and Richard, reciting the articles of 1732, and agreeing that the like powers and authorities given by the will of John Penn, to the possessor of the time being, with respect to his moiety, should be likewise given to the possessors of their quarter parts respectively. This agreement ratifies and confirms the agreement of 1732, except in such parts as are thereby altered expressly. By these articles it is

provided, that all fines and purchase moneys shall, as to the respective quarter parts of the province, belong to the possessor for the time being of each respective quarter part, as his own proper money.

On the 21st March 1750, Richard Penn, by his will, devises his fourth part of the province to his eldest son for his life, remainder to the first and other sons of John in tail male, with remainder to his son Richard and his sons in like manner; and declares, that although the rents, quit rents and purchase money growing due in the time of each owner of his own quarter part of the province, may in strictness be considered as due to and part of the personal estate of such owner at his decease, yet to avoid confusion, his will was that all such rents and purchase money due in his the testator's life-time, and not collected in at the next quarter day after his decease, should go with the province to the next person in remainder to whom he had limited his fourth part of the province.

Thus John Penn, the eldest son of Thomas, after the death of his father, held one moiety of the province as tenant in tail under the will of his uncle John Penn, and one fourth under his father Thomas, likewise in tail, by virtue of Thomas's 'settlement on his marriage of the 15th August 1751, referred to in his will of 1771. So that the only infraction of the articles of 1732, attempted to be made with regard to the vesting estates tail in the immediate descendants of the three brothers, was made by Richard Penn, in devising an estate for life to his son John.

As to the arrears of quit rent and purchase money, John the elder had devised the whole to his brother Thomas, and by the articles of 31st January 1750, Thomas, and Richard agree, that all quit rents in arrear should go with the inheritance; but that all fines and purchase moneys of their respective quarter parts should belong to the possessor of such quarter part for the time being, as his own proper money. But by the wills both of Thomas and Richard, it appears they forsaw that infinate confusion in the accounts of the receiver general would ensue, from not distinguishing between such rents and purchase money, as should be paid in during the respective lives of the possessors, and those, which though due, should not be paid into the receiver general's office, within three months after the death of each possessor; they therefore provide by their wills, that though they consider the whole as personal estate, and subject to their disposal as such, yet they direct that such moneys as should appear by the receiver general's accounts not to have been paid within three months after the

death of each possessor should go to the next possessor. And this they recommended to their successors as a mode proper to be pursued by them. It was certainly a prudent provision, but what they seemed to think was not in their power to enforce in any other way than by a recommendation.

But the propriety and necessity of pursuing this mode was in a great measure rendered nugatory, by the great subsequent event that followed, during the continuance of the revolutionary war, and by the act of assembly of 1779, which vested almost the whole proprietary estate in the commonwealth of Pennsylvania. By this act all the quit rents were abolished; no part of the ungranted and unlocated lands was left the property of the proprietaries; all that remained to the family, were such reserved lands and manors as had been surveyed for them, in lieu of their tenths reserved under the concessions made with the first purchasers by their ancestor William Penn the founder of the province, together with a few tracts of land which they had purchased of private men, for the accomodation of some of the country towns. The infinite confusion, therefore, in the land office accounts, which Thomas and Richard Penn had been so anxious to guard against, no longer existed; and the reason and necessity of their prudent recommendation to their successors entirely ceased.

The legislature of Pennsylvania having vested the proprietary estate in the commonwealth, thought fit to make a grant to the family of the sum of 130,000*l.* sterling, to be paid to them according to their just equitable rights, to be thereafter ascertained, agreeably to justice and equity.

Under this new order of things, it seemed prudent and proper for the several branches of the Penn family, to come to some amicable settlement of their rights. This was accordingly done, and no conflicting claims remain, but the subject of the present action.

The great question is, what is the true construction of the articles of 1787, with respect to the produce of the sales of land made by John Penn in his life-time, after the 29th November 1779?

In considering this case, I shall first take notice of the respective rights of the parties, when they entered into the agreement.

Secondly, What were their probable inducements for entering into it.

And thirdly, What is the effect and true construction of the article?

1. The respective rights of the contracting parties stood thus:

John, as the then present possessor of his father's one fourth part of the lands, whether as tenant in tail under former settlements, or tenant for life under his father's will, had a power to sell in fee simple, the unlocated lands in the province. Whether under this general power, he had a right to sell the manors and reserved lands, being the private and particular estate of the proprietaries, and distinguished as such in the will of Richard Penn, seems to have been made a question in the family; and therefore, a conveyance was executed on the 14th May 1774, by a *tripartite* deed, between Lynford Lardner, Richard Peters and Richard Hockley, the American executors of Richard Penn, having a power by Richard Penn's will to sell these manors and reserved lands, of the one part; Richard Penn the plaintiff, of the second part; and his brother John Penn of the third part; wherein these executors and Richard Penn the plaintiff, convey the manors and reserved lands to John Penn, to be held by him in the same manner as he held the other lands in the province. It seems therefore to have been the idea of all the parties, that John either under former agreements and wills, or under this deed of 1774, had a power to sell the reserved lands, as fully and effectually as he might have sold the other lands.

The rights of Richard Penn the younger, were derived to him as next in remainder after the death of his brother without issue, with all the appendages and powers annexed thereto, by the settlements and wills. He had a right to succeed to the enjoyment of, and then to sell all such of the manors and reserved lands as should not be sold by John in his life-time; but he had no right to receive any money arising from sales made during the life of John.

2. What were then the proposed benefits arising to the parties, and what were their probable views and inducements for entering into this agreement?

The two brothers and their families resided then in different countries, John Penn in America, and Richard in England. It was probably the wish of both to close their family concerns in this country as soon as possible. The only remaining estate consisted in manors and reserved lands, which though always conveyed before the resolution under the same solemnities with the other lands, (I mean by warrants, surveys and patents under the great seal) yet as to the price they were differently circumstanced. For the unlocated lands there was a stated price, from time to time ascertained and promulged to the people. But the price of reserved land was always settled by special agreement between the proprietaries and the several persons who offered to purchase, and was always considerably higher than the other lands. Since the revolution, they were conveyed to the pur-

chasers by common deeds of conveyance from John Penn, jun. and John Penn the then proprietors, and bonds and mortgages given for securing the payment of the purchase money to them, in their individual characters. John Penn the testator, being on the spot, could always sell for the best price. The two brothers were equally healthy men, with no great difference in their ages. Richard, although the youngest and next in remainder, might possibly not survive his brother, and in that case would himself have received no benefit from the estate. By entering into this agreement, Richard was regularly to receive one-third of the proceeds of the sales, and might have thought the present use of the money, and the power of equalizing it among his children, of greater importance than the chance of survivorship, or the eventual accession of a future larger estate to his eldest son. Whether he had a right to bind such eldest son by such an agreement, is not now the question, as between the present parties in the present suit. He had certainly a right to bind himself.

Another inducement to Richard might arise, and most probably did arise, from an apprehension that his brother John, having a power to sell, might during his life, dispose of all the reserved lands, in which case nothing would be left to him to enjoy after the death of John, whereas in consequence of this agreement, and of John's refraining from making hasty sales, a considerable portion of those lands are left to be disposed of by Richard.

The substance of the agreement executed on 14th March 1787, is as follows :—It recites the act of assembly of 27th November 1779, vesting the proprietary estate in the commonwealth of Pennsylvania, and making a grant of 130,000*l.* sterling, to the devises and legatees of Thomas and Richard Penn, and to the widow and relict of Thomas Penn, in such proportions as should thereafter be deemed equitable and just by the legislature. It then suggests, that it is reasonable and proper, that after so great an alteration in the affairs and estate of the proprietary family, that the money granted by the legislature should be settled and proportioned in an equitable and conscientious manner, as far as concerns the parties to that agreement. And it is then covenanted, that all that part and share of the 130,000*l.* directed to be paid to the devisees or legatees of Richard Penn, which has been, or should be paid during the natural life of John Penn, should be received by the said John Penn, and that he should pay over one third part thereof to the said Richard Penn, and his representatives from time to time, as often as he should receive the same. Then follows the convenant immediately applicable to the present case, in substance as follows :

—That all the moneys arising from the sales of any such lands, as were or are the property and estate of the heirs or devisees of the said Richard Penn, deceased, 'originally made not before, but since the 27th November 1779, or which shall hereafter be made by the said John Penn during his natural life, shall be received by the said John Penn, and that he John Penn, shall pay over one third part thereof to the said Richard Penn, and his representatives, from time to time, as often as he shall receive the same. Then follows a provision and covenant, that nothing therein contained shall prevent or disable the said John Penn from exercising the powers with which he is vested, under former agreements and wills, so far as to grant and dispose of any part, or parts of the lands aforesaid, in order that the same may be reconveyed, two third parts thereof to the said John Penn and his heirs, and the other third part of the same to the said Richard Penn and his heirs, in fee simple, reserving thereupon some quit rent.

3. What is the true construction of this article ? It had two objects, the ascertaining their respective shares of the legislative grant of money ; and secondly, a division of the produce of the sales of land made, and to be made by John.

As to grant of a fourth part of 130,000*l.* by the legislature, it makes no part of the present question, having, I presume, been all paid to John in his life-time, either in money or certificates, and a third part paid over by him to Richard. But it may be necessary to consider this clause, as it may tend to assist in the construction to the other. The parties both knew, that this money was to be paid at different times by instalments, and John's rights to two thirds is expressly confined to such payments as should be actually made during his natural life. If therefore, any instalments had been left unpaid at the time of John's death, they would have been the actual representatives of Richard the father, at the time of the payment of such instalments.

The clause relating to the lands is differently worded. It directs, that for the lands to be sold by John during his natural life, he shall receive the whole money, and pay one third thereof to Richard. If it had been meant to be a provision similar to the former clause, it would probably have been otherwise expressed. It would have run, "for the lands sold and paid for, during his natural life ;" but the words natural life are expressly confined to the sales, and not to the money to be received. But supposing the expression to be equivocal, a strong argument arises from the subsequent clause, to show that it was meant John should

have the absolute property in two-thirds of the money, whether it was paid during his life or after his death. The clause I mean, is inserted to enable John to make use of his general power to sell lands, for the purpose of having the same reconveyed, two-third parts thereof to the use of John Penn and his heirs, and the one-third part thereof to the use of Richard Penn and his heirs, in fee. Can it be conceived, that in case the land should have been conveyed, and reconveyed in pursuance of this latter clause, John should confessedly have the absolute property in fee simple, in two-thirds of the whole of the reconveyed lands, and yet the meaning be, that for such parts of the land as he should sell in the ordinary way to strangers, he should not have the absolute property in the money for which the land should be sold, but that his right to it should depend on the precarious event of the time when it should be paid for?

But it is objected on the part of the plaintiff, that by the words of the article, the whole money was to be received by John Penn, without adding the words " executors or administrators," whereas the one third part thereof directed to be paid over to Richard Penn is followed by the words " and his representatives ; from whence it is inferred, that it was the meaning of the parties, that John's representatives were to receive nothing. To account for this omission, if it be one, it will be necessary to look a little further back. By the family agreements, particularly by the articles executed on the 31st January 1750, between Thomas and Richard Penn, it is expressly stipulated, that although the arrears of quit rents should descend and go with the inheritance, yet as to the fines and purchase moneys, they should belong to the possessor for the time being, as his own proper money. Under this idea it was probably that Thomas and Richard Penn in their several wills, consider the money due to them at the time of their respective deaths, arising from the sales of lands in their lives-times, as part of their proper and distinct personal estate. If therefore John Penn, as one of the proprietaries, was considered by the contracting parties in 1787, as entitled in the same manner to the produce of the sales made in his time, as his own proper money, it might have been thought useless to subjoin the words " executors and administrators," whereas in Richard's case, if he should die before John, it might be thought necessary to subjoin the words " his representatives," in order that Richard's children might receive the benefit of the agreement.

But it is said, that by the wills of Richard and Thomas Penn, it is recommended, in order to avoid confusion in the accounts of the land

office, that such sums as should be paid into the receiver general's office, after three months from the time of the death of each possessor, should likewise go with the inheritance; and that as John took some valuable property under his father's will, it was incumbent on him to consider this recommendation as a condition annexed to the bequest. In answer to this, it must be observed, that in the year 1787, the great object of this recommendation had entirely ceased. It was then known to both the contracting parties, that the proprietary office of receiver general had not been for a long time in existence, the whole business of the land office being then transacted in behalf of the state, and by the officers appointed by the new government. It is therefore more probable that the parties had an eye to the stipulation of 1750, which directed the purchase money should belong to the last possessor as his own proper money, than to the unadopted and then impracticable recommendation of their father and uncle, that it should go with the inheritance. If so, it is not to be wondered at, that the executors of John should not have been inserted in the covenant, especially when it is considered that this was not a grant from Richard to John, of what John had no right to before, but as far as it went was a subtraction from John's existing right.

Another reason may be likewise suggested for this omission. The payments for the general unlocated lands in the province had been made in a very different manner from those made on the purchase of the reserved lands. In the former case, a small part of the purchase money only was generally paid at the commencement of the title: in the case of locations, one dollar only for each tract, the remainder of the purchase money continued unpaid for perhaps many years afterwards, and was indeed never finally discharged till the parties found it necessary to take out their patents of confirmation, when all the arrears were paid up, together with interest from the time of the original settlement. The practice was quite otherwise on sales of unreserved lands. The whole money was either paid at the time of the sale, or bonds and mortgages were taken in the names of the then existing proprietaries. This being known to the parties when this agreement was executed, and there being then none but reserved lands to be sold; in which cases the sale and payment, or security went hand in hand together, there might appear no necessity to introduce the word executors at all in the covenant.

Upon the whole matter, no undue advantage appears to have been taken on either side. The parties made their agreement under a thorough knowledge of their respective rights. No

great inequality, if any, appears in the contract, especially as John made no settlement on his wife, which he had a power to do by the several family agreements, and as he might, consistently with the express provisions of the article, if he had suspected such a construction as the present on the part of the plaintiff would have been contended for, have conveyed the whole reserved lands, and taken back a conveyance to himself for two thirds, in fee simple ; his not doing this shows at least his sense of the agreement.

The question stated in this case is, whether Richard Penn the plaintiff, is entitled to all the purchase money due on sales of land made by John Penn, which were not collected in by the quarter day next after the death of John Penn, or only to one third part thereof? I am of opinion, for the reasons before assigned, that Richard Penn is not entitled to the whole of the purchase money, arising from sales made by John after the 27th November 1779, but only to one third part thereof.

Yeates, J. The agreement of 8th May 1732, made between the then proprietaries of Pennsylvania, stipulates (amongst other things) that neither of the parties shall dispose by will, or otherwise, of his share to any child, except to his eldest son in tail male, with remainder over to his second, third, and other sons in tail male successively, but that during their joint lives, may revoke the agreement by any writing under hand and seal. The agreements of 31st January and 20th March 1750, make no variation herein, in the case of either party having male issue, and expressly confirm the first articles, so far as they are not altered by the subsequent ones ;—they contain the same clause of power of revocation. It would seem, therefore, that the defendant's testator, under the operation of those family agreements and his father's will, would be entitled to an equitable estate tail in the lands devised to him. Richard Penn, (the 1st. could not, without the concurrence of his brother Thomas, then living, revoke the former agreement, nor does this appear to have been his intention.

It does not however strike me, to be of any moment in the decision of the present question, whether John Penn the second, was tenant in tail, or for life, and therefore I lay no stress on it. After his father's death, while in possession, he had the undoubted power, under the agreement of January 1750, " notwithstanding his limited estate or interest for life, or in tail, to grant any estate or interest how large soever, of any lands or other hereditaments, on the usual quit rents." And any question which might arise, as to the

same Richard's private and particular rights to manors or reserved lands, or his shares of any manors or reserved lands, is at rest under the deed *tripartite* of 17th May 1774, and the estate of the same John therein is confirmed.

The American revolution formed an important *epoch* in the affairs of the late proprietary family. The legislature of the estate declared, by a law passed the 27th November 1779, (1 Dall. St. Laws 822, § 2,) that " the claims of the late proprietaries to the whole of the soil contained within the bonds of the royal charter, and the quit rents, and purchase money, upon all the grants of lands within the said limits, cannot longer consist with the safety, liberty and happiness of the good people of this commonwealth;" and therefore vested the proprietary estates, in the commonwealth, excepting therefrom their private estates, their tenths or manors, and the quit or other rents reserved out of the same. § 8. The freemen of the state, desirious to manifest their liberality, and to prevent the disappointment of sundry marriage settlements, and testamentary dispositions, made a donation of 130,000*l.* sterling, payable by instalments, to the devisees and legatees of the late proprietaries, and the widow and relict of Thomas Penn, " in such proportions as should thereafter, by the legislature, be deemed equitable and just, upon a full investigation of their respective claims." §§ 12, 13, 14.

On the part of the late proprietary family, we may fairly presume, that the payment of this sum of money was considered in the light of a mere act of justice, and that it came in lieu of the estates they had been divested of. Of this sum, the devisees of Richard Penn (the 1st) were entitled equitably and justly to one fourth part, but their respective proportions were not fixed and ascertained by the act. In the language of the sons, as contained in their articles of 14th March 1787, " it was resonable and proper, that after so great an alteration in the affairs and estate of the proprietary family, the money should be settled and proportioned in an equitable and conscientious manner, as far as they were concerned ; and therefore they make an amicable division thereof, well knowing that in case of disagreement, the will of the legislature must be the *dernier resort*.

If this 130,000*l.* was considered as an equivalent for the lands of the family, and governed by the limitations and provisions expressed in the different wills and agreements, the payments thereout, according with correspondent sales of the real estate, John Penn (the 2d) was the immediate devisee in tail or for life, with power of disposition, of one fourth part thereof, and his brother Richard was the next remainder man.

The periods of payment had commenced, but the life of the elder son advanced in years, was held by a tenure highly uncertain. He had been married, but had no prospect of issue. On the other hand, he might survive the ultimate instalment of the 130,000l. and the sales of all the proprietary private estate and manors ; and his brother might stand in immediate need of cash. Richard was not much younger, nor more healthy than John. Under these circumstances, articles were concluded on between the brothers, that the proportion of the 130,000l. which had been or should be paid during the natural life of the said John Penn, to the devisees and legatees of his father, should be received by him, and that he should pay over one third part thereof to his brother Richard and his representatives, from time to time, as often as he should receive the same. And that the moneys arising from the sale of any of his father's lands, made not before, but since the 27th November 1779, or which should thereafter be made by the same John during his natural life, should be received by him, and that he should pay over one third part thereof to his brother Richard and his representatives from time to time, as often as he should receive the same. With a particular provision, that the defendant's testator might exercise the powers with which he was vested, under former agreements and wills, so far as to grant and dispose of any part of the lands, in order that the same might be reconveyed ; two third parts thereof to the said John and his heirs, and the other third part thereof to his brother Richard and his heirs, in fee simple, reserving thereupon some quit rent.

If any part of the 130,000l. remained unpaid in the life of the defendant's testator, it is obvious to me, that the plaintiff would be entitled to the full one fourth part thereof ; as their mutual agreements restricted the two third parts to the former, to payments made during his natural life.

As to lands sold before 27th November 1779, the articles are expressly declared not to relate thereto, and consequently, the will of Richard Penn ( the 1st,) and the family agreements must regulate the same. If the moneys have not been collected in by the quarter day next after the decease of John, they go over to the plaintiff his brother, provided they are collected in his life-time, or the quarter day next thereafter.

The question remaining is, whether the plaintiff is entitled to the whole, or only one third part of the monies, due on the sales of lands made by John Penn, after the 27th November 1779, uncollected at the quarter day next after his decease ?

It is clear, that the private estate and manors of the Penn family, re-

mained unaffected by the act of the legislature already mentioned ; and also that the children of the plaintiff can have no well grounded claim to monies received in their father's life-time. The pretensions of the heir must rest on the possession of the share of his ancestor. The possessors of the proprietary estate for the time being, were vested with the power of selling ; and if the moneys produced by such sales were paid in, either in the lives of the defendant's testator, or of the plaintiff, or at the quarter days next following their deaths, the issue of the latter could not be entitled thereto. As to those sums therefore, the brothers John and Richard were warranted to make any equitable, arrangements between themselves, to meet their own convenience.

After fully revolving in my own mind the point submitted to us, under every shape in which it suggested itself, I am of opinion, that the plaintiff is entitled to only one third part of the money due on the sales of lands made by the defendant's testator, which were not collected in by the quarter day, next after his death. I cannot bring myself to believe, that it is material as to the plaintiff, when such money is received, provided it is during his life. By his agreement, the change of the real into the personal property, vests, as to him, an immediate interest in his brother, with respect to two third parts thereof. This appears to me to be the natural and true meaning of the parties in their agreement, and does no violence either to the legal or grammatical operation of the words. I can see no reciprocity in any other construction.

John relinquishes to Richard one third part of the quarterly sum of 130,000*l.* though it may be received by him in his life-time. If Richard should die before him, the payment of the one third is to be continued to his representatives ; but should Richard outlive him, the interest of the family of John in the two thirds ceases entirely.

Would there then be any mutuality, that in the event of Richard's dying first, the payment of one third of the money produced by the sales of lands after the 27th November 1779, by John, should go on to his representatives ; but that in the event of Richard's surviving John after actual sales made by the latter, the moneys thereafter to be received therefor by the former, should be wholly absorbed in his estate?

The expressions in the articles vary materially, as to the legislative donation, and the moneys arising from the sales of lands. In the former, the proportion due to John, is confined to money which has been, or shall be paid, during his natural life. But not so in the latter ; the sales, and not the payment of the consideration, are confined to

the life of John. The inequality of the articles taken in a different sense from what I have adopted, is so striking to my mind, that I am induced to believe they were calculated to correct it. No rational ground in the other construction can be traced for the insertion of the *proviso* in the close of the agreement; this has been ably shown in the argument of the Chief Justice. Every cession would thus be made on the part of John, while nothing is ceded on the part of Richard, to form a contract " equitable and conscientious. "

It must be admitted, that both Thomas and Richard Penn, by their wills, in pursuance of their agreement of January 1750, provide, that moneys uncollected on sales, as well as quit-rents, should go over to the different remainder men in possession. And it is objected, that while the defendant's testator has received the rents, &c. due to his father in his life-time, he shall also be bound to the same measure in the case of his brother. A devisee claiming under a will, shall not disappoint the intention of the testator. The authorities cited fully prove this point. Abstracted from the last agreement, they would certainly have controlled the present question. As this case is circumstanced, and as between the parties before the court, they do not appear to me to be applicable.

No one in this instance can complain of the infraction of the will of Richard Penn the first, except the plaintiff; and it lies not in his mouth to complain of his own act, made on a perfect knowledge of his rights after due deliberation, with attention to his immediate interests. He was competent to make an agreement with his brother, so far merely as it concerned themselves; and having fairly done so, the maxim *volenti non fit injuria* holds in its full extent. Plowd. 501. This appears to me to be a satisfactory answer to the cases relied on by the plaintiff's counsel.

On the whole, I concur with the Chief Justice, that judgment be rendered for the defendants.

Smith, J. I have considered this case, and having seem the Chief Justice's opinion in the vacation, I subscribe fully thereto I cannot add to his argument without doing it an injury.

Judgment for the defendants.

During the vacation, Jared Ingersoll, esq. resigned the office of attorney general, and was appointed by the president of the United States attorney of the United States for the district of Pennsylvania.

Joseph B. McKean, esq. was appointed his successor, as attorney general of Pennsylvania.